# *Exhibit 6*

**Fried, Frank, Harris, Shriver & Jacobson LLP**

801 17th Street, NW
Washington, DC 20006
Tel: +1.202.639.7000
Fax: +1.202.639.7003
www.friedfrank.com



Direct Line:  (202) 639-7040
James.wareham@friedfrank.com

November 10, 2017

**VIA FEDERAL EXPRESS**

Mr. Eric L. Zagar
Kessler Topaz Meltzer & Check LLP
280 King of Prussia Road
Radnor, PA 19087

     Re:    <u>Letter Sent on Behalf of Dr. Scott King.</u>

Dear Mr. Zagar,

     I write on behalf of Under Armour, Inc. (the "Company") with regard to your May 25, 2017 letter.

     As noted in prior correspondence, the Company's board of directors (the "Board") constituted a group of independent and disinterested directors to review the allegations set forth in your letter.  The review group, with the assistance of independent outside counsel, completed its investigation and issued a final report to the Board.  A copy of the report is attached.  The review group (i) found no evidence supporting the allegations set forth in your May 25, 2017 letter; and (ii) recommended that the Board decline to pursue claims against those whom you identified.

     At a meeting held on November 6, 2017, a majority of disinterested and independent directors voted to adopt the findings and recommendations in the report.

Sincerely,

James D. Wareham

Enclosure

**New York • Washington • London • Paris • Frankfurt**
Fried, Frank, Harris, Shriver & Jacobson LLP is a Delaware Limited Liability Partnership

14672948

**REPORT AND RECOMMENDATION**
**OF THE REVIEW GROUP OF UNDER ARMOUR DIRECTORS**
**ON THE DEMAND LETTER SUBMITTED BY SCOTT KING**

**October 25, 2017**

**Table of Contents**

I.    **Background** ................................................................................................ **2**

   A.   Relationship Between Under Armour and Kevin Plank ............................ 2
   B.   The Demand Letter .................................................................................. 2

II.   **The Board's Response to the Demand Letter** ......................................... **3**

   A.   Delegation to Review Group ..................................................................... 3
   B.   Retention of Counsel................................................................................. 3
   C.   Scope of Review by Counsel ..................................................................... 4
   D.   Review Group Meetings and Communication with Counsel ...................... 5

III.   **Considerations Evaluated by Review Group** ......................................... **5**

IV.   **Legal Assessment of Potential Claims** ..................................................... **6**

   A.   Choice of Law............................................................................................ 6
   B.   Breach of Fiduciary Duty.......................................................................... 6
   C.   Business Judgment Rule ........................................................................... 7

V.   **Related-Party Transactions and Usurpation of Corporate Opportunity** ..... **7**

   A.   Legal Standard Governing Related-Party Transactions............................. 7
   B.   Legal Standard Governing Usurpation of Corporate Opportunity ............. 7
   C.   Key Findings ............................................................................................ 8
   D.   Conclusions.............................................................................................. 13

VI.   **Failure of Oversight** ................................................................................... **8**

   A.   Applicable Law ........................................................................................ 14
   B.   Key Findings and Conclusions ................................................................ 14

VII.   **Additional Considerations** ...................................................................... **15**

   A.   Indemnification ....................................................................................... 15
   B.   Business Considerations .......................................................................... 15

VIII.   **Recommendation** ...................................................................................... **16**

### I.    Background

#### A.    Relationship Between Under Armour and Kevin Plank

1.    Under Armour ("UA" or the "Company") is a publicly-traded, clothing and accessories company headquartered in Baltimore, Maryland. The Company was founded by Kevin Plank ("Plank"), who currently serves as Chief Executive Officer and Chairman of the Board.

2.    The Company's 2017 Proxy Statement describes four categories of related-party transactions between UA and Kevin Plank.

    a.    <u>Port Covington:</u>  In 2014, UA entered into a lease agreement for an office building located near UA's headquarters. The office building was owned by an entity controlled by Plank. Two years after entering the lease, UA decided to acquire the land parcel that included the office building, as well as several surrounding parcels, as part of an effort to move or expand its corporate headquarters. In 2016, the Company acquired these parcels from entities controlled by Plank for $70.3 million.

    b.    <u>101 W. Dickman Street:</u>  In 2015, UA entered into a lease agreement for an industrial space in Baltimore. The space is owned by an entity controlled by Kevin Plank. UA began lease payments in April 2016, and made total lease payments of $0.4 million in 2016.

    c.    <u>Commercial Aircraft:</u>  UA paid approximately $2.4 million in 2016 to lease a jet aircraft and a helicopter aircraft from Plank.

    d.    <u>Sagamore Pendry Hotel:</u>  Entities controlled by Plank and his brother Scott opened a hotel in Baltimore in 2017. UA expects to use the hotel from time to time for Company purposes. UA did not make payments to the hotel in 2016.

3.    The Company's 2017 Proxy Statement further states that any related-party transaction must be approved by the Board, which has delegated oversight of these matters to the Audit Committee. The members of the Audit Committee are A.B. Krongard, Anthony Deering, and Douglas Coltharp.

#### B.    The Demand Letter

1.    On May 30, 2017, UA's Board of Directors (the "Board") received a letter (the "Demand Letter") from Eric L. Zagar ("Zagar"), written on behalf of UA shareholder Scott King.

2.    The Demand Letter alleges that Plank breached his fiduciary duty to the Company by:

a.   Exploiting confidential Company information (i.e., the Company's need to move its headquarters) for his own gain;

b.   Usurping a corporate opportunity from UA to purchase and develop land for the Company's future campus;

c.   Driving up the price of the land in Port Covington that he would subsequently cause the Company to buy;

d.   Causing the Company to buy the land in Port Covington at an excessive price; and

e.   Causing the Company to enter into a number of other unfair related-party transactions.

3.   The Demand Letter further avers that the Board breached its fiduciary duties to the Company by:

a.   Approving the purchase of Port Covington at an inflated price; and

b.   Approving other related-party transactions designed to unfairly benefit Plank

4.   Pursuant to these Potential Claims, the Demand Letter asked the Board to take action to recover damages and correct any deficiencies in the Company's corporate governance.

## II.   The Board's Response to the Demand Letter

### A.   Delegation to Review Group

1.   The Board sent Zagar an acknowledgment of receipt on June 1, 2017. Thereafter, the Board delegated authority to two UA directors (the "Review Group") to review the Demand Letter and make a recommendation to the full Board.

2.   Eric Olson was chosen to lead the Review Group. George Bodenheimer also agreed to serve on the Review Group. Both individuals are considered independent directors under NYSE listing standards. Both also completed independence questionnaires, and there is nothing to suggest, based on their responses, that either Review Group member has a conflict of interest or other reason that would prevent him from impartially considering the Demand Letter.

### B.   Retention of Counsel

1.   The Review Group retained Williams & Connolly LLP as independent counsel ("Counsel") to assist in investigating the issues raised in the

3

Demand Letter.  Williams & Connolly does not provide any other legal services to UA.

**C.   Scope of Review by Counsel**

    1.    **Document Review**

        a.    Counsel reviewed the following documents in relation to the issues raised in the Demand Letter:

| Category | Description |
| --- | --- |
| Public Documents | • Press and media coverage discussing UA's related-party transactions with Plank, from 2010 to present<br>• Approximately 2,000 pages of pleadings and other documents from *In re: Under Armour Securities Litigation*, Case No. 1:17-CV-00388-RDB (D. Md.) |
| SEC Filings & Associated Press Releases | • <u>Annual Reports</u>: Form 10-K, filed on February 20, 2015; February 22, 2016; and February 23, 2017<br>• <u>Definitive Proxy Statements</u>: Form 14A, filed on March 15, 2013; March 21, 2014; March 13, 2015; July 13, 2015; March 11, 2016; and April 13, 2017 |
| UA Governance Documents | • UA's Articles of Incorporation<br>• UA's Bylaws |
| UA Internal Documents | • Approximately 2,000 pages of Company documents (emails, presentations, meeting notes, etc.)<br>• UA's policy governing related-party transactions<br>• Independent appraisal information regarding the Company's related-party transactions with Kevin Plank<br>• Independence Questionnaires of the Review Group<br>• Board Materials and Meeting Minutes, from 2014 to 2016<br>• Audit Committee Materials and Meeting Minutes, from 2014 to 2016 |

    2.    **Interviews**

        a.    Counsel interviewed the following individuals:

| Name | Position |
| --- | --- |
| Kevin Plank | Chief Executive Officer and Chairman of the Board |
| A.B. Krongard | Company Director |

| Anthony Deering | Company Director |
|---|---|
| Andrew Page | Corporate Controller |
| Neil Jurgens | Senior Vice President, Global Real Estate |
| Mehri Shadman | Senior Counsel, Corporate |

Counsel also interviewed Tom Geddes, Chief Executive Officer at Plank
Industries, to obtain information on related-party transactions between UA and
entities controlled by Kevin Plank.

3.    **Legal Research**

a.    Counsel conducted legal research on a number of issues, including:
(i) Maryland's choice of law doctrine; (ii) the duties and
obligations of the Review Group; and (iii) substantive law related
to the Potential Claims.

4.    **Contact with Shareholder's Counsel**

a.    On June 21, 2017, Counsel wrote to Zagar and requested
documentation of UA stock ownership by Scott King.  Counsel
also invited Zagar to provide "any additional information that you
would like the directors to consider."

b.    Zagar did not provide additional information, but did raise several
other issues in subsequent letters, which Counsel directed to the
Company and its legal counsel.

D.    **Review Group Meetings and Communication with Counsel**

1.    The Review Group met with Counsel on October 9, 2017 to discuss the
status of the investigation.  Counsel also communicated in writing with
members of the Review Group from time to time.

5

**III.**   **Considerations Evaluated by Review Group**

    **A.**    The Review Group, under the advice of Counsel, considered the legal merits of the Potential Claims asserted in the Demand Letter.

    **B.**    As part of its fiduciary obligations, the Review Group also examined whether it would be in the best interest of the Company to bring the Potential Claims or to permit such claims to be prosecuted derivatively.

    **C.**    As discussed more fully below, these considerations included, but were not limited to:

        1.    Legal issues

            a.    Fiduciary duties of UA directors and officers

            b.    Burdens of proof relative to Potential Claims

            c.    Defenses to Potential Claims

        2.    Other considerations

            a.    Costs to bring Potential Claims, including indemnification and advancement of defense costs for UA directors and officers

            b.    Likelihood and magnitude of financial recovery from Potential Claims

            c.    Potential distractions and impairment to morale for UA directors, officers, and employees arising from bringing Potential Claims

            d.    Effect on UA's operations arising from bringing Potential Claims

            e.    Effect on UA's reputation arising from bringing Potential Claims

            f.    Effect on UA's ability to attract and retain talented directors, officers, and employees if UA were to bring Potential Claims

**IV.**   **Legal Assessment of Potential Claims**

    **A.**    **Choice of Law**

        1.    Because UA is a Maryland corporation, the Potential Claims are governed by Maryland law. *See Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982).

    **B.**    **Breach of Fiduciary Duty**

        1.    Maryland recognizes a corporate claim against directors and officers for breach of the fiduciary duties owed by such officials. *See, e.g.,*

6

>*Werbowsky v. Collomb*, 766 A.2d 123 (Md. 2001). These fiduciary duties
>include the duty of good faith, the duty of loyalty, and the duty of due
>care. MD. CODE ANN., CORPS. & ASS'NS § 2-405.1(c).

**C.     Business Judgment Rule**

>1.     Maryland applies a presumption of disinterestedness, independence, and
>reasonable decision-making to all business decisions made by a board of
>directors, including decisions made in response to a shareholder demand
>letter. *Oliveira v. Sugarman*, 152 A.3d 728, 736 (Md. 2017); MD. CODE
>ANN., CORPS. & ASS'NS § 2-405.1(g) ("An act of a director is presumed to
>satisfy the standards of subsection (a) of this section.").

**V.     Related-Party Transactions and Usurpation of Corporate Opportunity**

**A.     Legal Standard Governing Related-Party Transactions**

>1.     MD. CODE ANN., CORPS & ASS'NS § 2-419 governs related-party
>transactions, and states that "a contract or other transaction between a
>corporation and any of its directors or between a corporation and any other
>corporation, firm, or other entity in which any of its directors is a director
>or has a material financial interest is not void or voidable" if:

>>a.     The fact of the common directorship or interest is disclosed or
>>known to [t]he board of directors or the committee,[1] and the board
>>or committee authorizes, approves, or ratifies the contract or
>>transaction by the affirmative vote of a majority of disinterested[2]
>>directors, *or*

>>b.     The contract or transaction is fair and reasonable to the
>>corporation.

>2.     Courts in Maryland have interpreted the foregoing provisions as creating a
>"safe harbor" for related party transactions. *Shapiro*, 764 A.2d at 277.

>3.     Additionally, under 17 C.F.R. § 229.404(a), public companies must
>disclose any transaction greater than $120,000 in "which any related
>person had or will have a direct or indirect material interest." 17 C.F.R. §
>229.404(a). Federal regulations further require the company to "[d]escribe

---

[1] Under Maryland law, a board of directors may delegate to a committee of one or more directors any of the powers of the board, with a few narrow exceptions not applicable here. MD. CODE. ANN. CORPS & ASS'NS 2-411.

[2] Although MD. CODE ANN., CORPS & ASS'NS § 2-419 does not define "disinterested director," official comments to this section refer to case law from New York, which defines an interested director as having "either self-interest in the transaction at issue or a loss of independence because a director with no direct interest in a transaction is controlled by a self-interested director." *Shapiro v. Greenfield*, 764 A.2d 270, 280–81 (Md. Ct. Spec. App. 2000) (discussing comments).

the . . . policies and procedures for the review, approval, or ratification of any [such] transaction." 17 C.F.R. § 229.404(b).

**B.    Legal Standard Governing Usurpation of Corporate Opportunity**

1.    Somewhat different from a related-party transaction, "most corporate opportunities do not involve transactions with the corporation; rather, they involve transactions that are taken from the corporation." *Shapiro*, 764 A. 2d at 277 (alteration omitted); *see id* ("[A] transaction should be analyzed under the corporate opportunity doctrine where a director seeks to take an opportunity from the corporation.").

2.    "In determining whether or not an opportunity is a corporate opportunity, Maryland follows the 'interest or reasonable expectancy' test, which focuses on whether or not the corporation could realistically expect to seize and develop the opportunity. . . . If the opportunity is a corporate one, then the director or officer to whom it is presented or who becomes aware of it must first present it to the corporation, before pursuing it himself or herself." *Dynacorp Ltd. v. Aramtel Ltd.*, 56 A.3d 631, 686 (Md. Ct. Spec. App. 2012) (alterations omitted). If "the corporation rejects the opportunity," the "director or officer [may] exploit it for his or her own benefit." *Id.*

**C.    Key Findings**

1.    Background

a.    Recognizing the potential for public misperception, the Audit Committee has taken measures and adopted processes to ensure that any related-party transactions between UA and Kevin Plank are necessary, are at or below fair market value, and are to the benefit of the Company. These processes reflect the Audit Committee's cautious and deliberative approach towards any such transactions.

b.    UA has a "Policy on Transactions with Related Persons." This policy was drafted with the assistance of counsel and is reviewed annually by the Board and Audit Committee. Pursuant to this policy, the Audit Committee considers, in determining whether to approve any transaction:

1)    Whether the terms of the transaction are reasonable and fair to UA and on the same basis as would apply if the transaction did not involve a related person;

2)    Whether the transaction would impair the independence of a non-management director; and

8

3)     Whether the transaction would present an improper conflict of interest, taking into account the size of the transaction, the materiality of a related person's direct or indirect interest in the transaction, and any other factors the Committee deems relevant.

c.     No member of the Audit Committee was self-interested in any of the related-party transactions at issue, and there is no evidence that any member of the Audit Committee was controlled by Plank.

d.     Prior to each Audit Committee meeting, Committee members receive a document prepared by UA summarizing all of UA's related-party transactions with Plank.

e.     Senior personnel at UA meet quarterly with management at Plank Industries to identify all current and potential future related-party transactions between UA and Plank.

f.     Plank Industries has adopted an internal policy where it will only enter into related-party transactions with UA at fair market value or below fair market value.

2.     Port Covington ($70.3 million)

a.     Prior to 2014, Plank approached the Board to propose that the Company purchase land around Port Covington, in order to accommodate the Company's growing need for space. The Board declined to undertake such a purchase at the time, reasoning that doing so would require significant expense and expose the Company to an unnecessary level of risk.

b.     Plank and the Board agreed, however, that Plank could purchase parcels surrounding Port Covington with his own resources and incur the expense (e.g., environmental due diligence, zoning, etc.) himself. There was no understanding, either express or implied, that the Company would eventually purchase any Port Covington parcels acquired by Plank.

c.     In early 2014, Plank, through an entity known as Sagamore Development Company ("Sagamore"), acquired a number of parcels around Port Covington.

d.     Plank envisioned transforming this space into a multi-use development, with a mix of residential, commercial, and entertainment space. Although Plank discussed this vision with others at UA, there is no evidence that Plank acquired these parcels on the understanding that UA would ultimately purchase the parcels from him.

9

e.     In 2014, UA's real estate team recognized that its current headquarters at 1020 Hull Street were near capacity. The Company faced a pressing need in 2016 for approximately 100,000 square feet of office space, with even more space necessary thereafter.

f.     UA, with input from the Board and Audit Committee, examined a number of potential sites to accommodate its space needs. It considered lease and purchase options for these sites. The Company ultimately decided to lease 2601 Port Covington, one of the Port Covington parcels, beginning in January 2016, for a number of reasons:

1)     *Pressing need:* 2601 Port Covington provided approximately 130,000 to 170,000 square feet of space, thereby addressing UA's 2016 space needs.

2)     *Favorable rate:* An independent market appraisal commissioned by UA provided a fair market rent of between $8 and $12 per square foot. After several rounds of negotiations, Sagamore agreed to lease the space to UA for $8.70 per square foot.

3)     *Flexibility:* Instead of purchasing parcels at Port Covington at the outset, an initial lease allowed UA time to evaluate the area and determine whether it would be appropriate to lease or acquire additional space in the future.

4)     *Presence of long-term lessee:* Although UA considered purchasing 2601 Port Covington and several surrounding parcels, it noted that Wal-Mart continued to hold a leasehold interest at 2701 Port Covington, an adjacent parcel. Wal-Mart's continued presence at Port Covington would encumber UA's plans to develop the site as a possible corporate headquarters, thus weighing against a purchase in 2014.

g.     The Audit Committee reviewed and approved the lease of 2601 Port Covington, for approximately $1.1 million per year, in September 2014. Prior to making this decision, the Audit Committee carefully scrutinized the independent appraisal undertaken on the site, and discussed the advantages and disadvantages of leasing space at Port Covington. In addition, the Audit Committee considered purchasing the site and several surrounding parcels, but recognized that Wal-Mart's continued lease on a nearby parcel would encumber UA's use of the land.

h.   In 2015, Sagamore negotiated towards a lease buy-out with Wal-Mart, which was completed in 2016. UA did not participate in these discussions.

i.   In early 2016, in considering where to move or expand the Company's corporate headquarters, both UA and the Audit Committee reviewed a number of different proposals. Port Covington emerged as an attractive candidate at the end of this process, particularly given the recent lease buy-out of Wal-Mart.

j.   Consequently, UA retained Ernst & Young to conduct a market appraisal of the Port Covington parcels. The Audit Committee, as a measure of its independence and diligence, retained Valbridge Property Advisors to conduct a separate market appraisal. Neither Ernst & Young nor Valbridge Property Advisors had a prior relationship with UA, the Audit Committee, Kevin Plank, or Sagamore.

k.   Ernst & Young recommended a fair market value range between $63.5 and $70.5 million. Valbridge Property Advisors recommended a fair market value range between $67.4 and $72.4 million. With these valuations in mind, UA negotiated a purchase price of $70.3 million for the Port Covington parcels.

l.   This purchase price represented an approximate $1.5 million loss to Sagamore. Sagamore had purchased the Port Covington parcels for $35 million in 2014. It thereafter incurred approximately $37 million in various costs, which included development costs (e.g., environmental and site work), planning costs (e.g., zoning and regulatory fees), carrying costs, and costs for the Wal-Mart lease buy-out. Sagamore paid $30.6 million for the lease buy-out of Wal-Mart.

m.   The Audit Committee reviewed and discussed the foregoing information. It carefully considered the proposed price and spoke with UA's real estate team to ensure that the Company received a fair deal. It separately retained Valbridge Property Advisors, which tested the assumptions made by Ernst & Young and by UA, and confirmed the estimated fair market arrived at by Ernst & Young. After multiple meetings, the Audit Committee approved the purchase of the Port Covington parcels in June 2016 for $70.3 million.

n.   Because the sale of the Port Covington parcels constituted a loss to Sagamore, Kevin Plank made no money on this sale.

3.   Commercial Aircraft ($2.4 million)

11

a.   UA has, since 2007, leased a jet aircraft from an entity controlled by Plank in order to facilitate executive travel to business meetings, advertising events, and other projects.

b.   UA entered its current jet leasing agreement in 2012. Prior to entering this agreement, UA obtained two independent appraisals of fair market value. These appraisals estimated a monthly lease price of $249,646 and $261,713 per month.

c.   Based on historical usage, UA estimated that the jet aircraft would be used for Company business 2/3 of the time, and for Plank's personal use 1/3 of the time. Consequently, the Company agreed to pay $166,666 per month (or $2 million per year) in fixed monthly rent, as well as a pro-rata share of pilot and fuel expenses.

d.   The Audit Committee reviewed and approved this policy in June 2012. UA has continued to monitor the use of this jet aircraft over time, and data suggest that the jet aircraft is typically used more than 2/3 of the time for Company business.

e.   In 2016, UA entered into an agreement to lease a helicopter aircraft from an entity controlled by Plank. Prior to entering this agreement, UA obtained an independent appraisal, which estimated an hourly lease price of $9,772 per hour.

f.   The Company agreed to pay $6,500 per hour for use of the helicopter aircraft, along with piloting and fuel expenses. The Audit Committee reviewed and approved this policy in September 2016. Since that time, use of the helicopter has been infrequent, and an even lower rate is being considered.

4.   101 W. Dickman Street ($0.4 million)

a.   In August 2014, UA began to search for a large industrial space to carry out the Company's domestic manufacturing initiatives. UA engaged an independent real estate firm to survey potential options in the Baltimore area. This firm identified several options, with the most advantageous location being 101 W. Dickman Street, a property already owned by Sagamore.

b.   In September 2015, UA hired an independent valuation firm to evaluate fair market rent for space at 101 W. Dickman Street. This firm estimated an annual lease rate of $8 to $12 per square foot.

c.   UA entered into a series of negotiations with Sagamore, and ultimately agreed to a below-market lease rate of $7.50 per square foot, for 68,000 square feet in the 130,000 square feet facility. This rate compares favorably to the rate of other tenants in the

same building; the most recent tenant pays approximately $12 per square foot for building space.

    d.    The Audit Committee reviewed and approved this policy in November 2015.

5.    Sagamore Pendry Hotel ($0 million)

    a.    In 2017, Plank, along with his brother, opened the Sagamore Pendry Hotel, a luxury hotel in downtown Baltimore. The Company did not pay money to Sagamore Pendry Hotel prior to 2017, but expects that some Company events may be held at this property in the future, which may result in net expenses over $120,000 per year.

    b.    The Company negotiated a preferred rate for UA personnel consistent with comparable hotels in the area. The hotel may not offer a lower rate to any other entity or business. These rates and arrangements were reviewed and approved by the Audit Committee in 2017.

**D.    Conclusions**

1.    There is no evidence that UA failed to properly disclose a related-party transaction with Plank.

2.    In addition, there is regular and consistent monitoring of all current and potential future transactions between UA and Plank, and regular examination of whether such transactions are necessary and to the benefit of UA.

3.    Pursuant to UA's internal policies, the Audit Committee reviews all such transactions, taking into consideration a number of factors. These policies and procedures are reviewed annually.

4.    Internal documents indicate that the Audit Committee carefully examined each proposed transaction, sought (at least one) independent third party appraisal, and ensured that negotiations between UA and the entity or entities controlled by Plank were at arms-length.

5.    UA paid fair market or below market value for each transaction. The Audit Committee, composed of three disinterested directors, reviewed and unanimously approved each transaction. Thus, contrary to the allegations in Demand Letter, Plank made no money on his sale of the Port Covington parcels to UA.

6.    The evidence likewise does not support a claim for usurpation of corporate opportunity. Plank presented the Board a proposal to purchase parcels

13

surrounding Port Covington.  The Board, exercising its business judgment, and in light of the risks presented, declined to do so.  Plank thus took on the due diligence, acquisition, and development costs himself, with no guarantee that UA would purchase these parcels from him at a later time.

7.　　In light of the foregoing, it is unlikely that a claim that (a) UA's related-party transactions were improper or that (b) Plank usurped a corporate opportunity from UA would succeed on the merits.

## VI.　Failure of Oversight

### A.　Applicable Law

1.　　The Demand Letter also appears to allude generally to deficiencies in corporate governance and oversight.

2.　　No Maryland court has addressed whether officers and directors have a duty of oversight to guard against corporate illegality.  Delaware, however, recognizes such a claim, *In re Caremark International Inc. Derivative Litigation*, 698 A.2d 959 (Del. Ch. 1996), and Maryland courts have looked to "Delaware law for guidance on issues of corporate law" in the absence of Maryland precedent, *Oliveira v. Sugarman*, 130 A.3d 1085, 1093 n.10 (Md. Ct. Spec. App. 2016).

3.　　In Delaware, a failure of oversight claim—known also as a *Caremark* claim—arises where "(a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

4.　　Because of the deference typically accorded to business decisions made by a board and the limited role of directors in everyday corporate affairs, courts have described *Caremark* claims as "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Caremark*, 698 A.2d at 967.

### B.　Key Findings and Conclusions

1.　　A *Caremark* claim would face a number of challenges.  Even assuming a Maryland court would recognize such a claim, the claim would require an underlying legal violation, and here there is no credible evidence that an underlying violation occurred.

2.　　Furthermore, the Board has instituted a related-party transactions policy, which appears to operate properly, and which was disclosed in the Company's Proxy Statements.

14

3.     Thus, it is unlikely that a *Caremark* claim—if recognized by a Maryland court—would succeed on the merits.

## VII.   Additional Considerations

### A.   Indemnification

1.     UA's Articles of Incorporation require the Company to "indemnify and advance expenses to a director or officer of the Corporation in connection with a proceeding to the fullest extent permitted by and in accordance with the indemnification provision of [Maryland law]."

2.     UA's bylaws further require the Company to "indemnify any present or former director or officer of the Corporation . . . against all expenses, liabilities and losses reasonably incurred or suffered by that person in connection with that status and to pay or reimburse their reasonable expenses in advance of final disposition of a proceeding."

3.     Taken together, these provisions could require UA to incur substantial legal costs, in order to both prosecute the Potential Claims and advance defense costs for the directors and officers at issue. Because none of the Potential Claims appear well taken, it is unlikely that UA would be able to recoup these costs.

### B.   Business Considerations

1.     Pursuant to the business judgment rule, the following considerations also inform the decision as to whether or not to pursue the Potential Claims:

a.     The potential to compromise UA's strategic development;

b.     The distraction to key employees from day-to-day business operations;

c.     The potential for adverse media attention and the effect on UA's reputation;

d.     The risk that litigation could damage UA morale, thereby diminishing employees' enthusiasm for work, creating mistrust, and leading to employee attrition; and

e.     The potential for counterclaims and countersuits resulting from UA's pursuit of the Potential Claims.

## VIII.  Recommendation

To summarize, the Demand Letter asserted that Plank had usurped a corporate opportunity from UA, and that UA agreed to a series of improper and overpriced related-party transactions.

The Review Group found no evidence to support these allegations.  Consequently, and in consideration of potential indemnification costs and other business considerations, the Review Group recommends that UA's Board reject the Demand Letter in its entirety.