IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE UNDER ARMOUR, INC. SHAREHOLDER DERIVATIVE LITIGATION | Civil Action No. GLR-18-1084 (Lead Case) |
| | (Consolidated with GLR-18-1264) |

\*\*\*

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants Under Armour, Inc., Sagamore Development Company, LLC, Kevin A. Plank, Douglas E. Coltharp, A.B. Krongard, Byron K. Adams, Jr., George W. Bodenheimer, Karen W. Katz, Williams R. McDermott, Eric T. Olson, and Harvey L. Sanders' Motion to Dismiss Plaintiff's Verified Consolidated Shareholder Derivative Complaint (ECF No. 44). The Motion is ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2018). For the reasons set forth below, the Court will grant the Motion.[1]

---

[1] Also pending before the Court is Plaintiff's Request for Hearing (ECF No. 48). Because the Court will grant the Motion, this request will be denied.

# I.     BACKGROUND[2]

This stockholder suit arises from allegations that Under Armour's (the "Company") founder and controlling stockholder, Kevin Plank, steered the Company into financially disadvantageous agreements with Plank's other companies, notably Sagamore Development Co., LLC ("Sagamore")—a real estate company that Plank owns through his personal holding company, Plank Industries. (Consol. Compl. ¶¶ 2, 7, ECF No. 42). In doing so, Plank and Sagamore allegedly benefitted financially to the detriment of the Company's stockholders. (Id. ¶ 1). The Company's Board of Directors allegedly breached its fiduciary duty by approving the transactions. (Id. ¶ 108). Lead Plaintiff Scott King[3] brings this action derivatively for the benefit of nominal Defendant Under Armour and alleges the following facts in support of his claim.

## A.     Challenged Transactions

Under Armour is a Maryland-based sports apparel brand that Plank founded in 1996. (Id. ¶ 2). In 2002, the Company relocated its global headquarters to the Locust Point section of South Baltimore, Maryland (the "Locust Point Headquarters"). (Id. ¶ 53). In 2008, the Company predicted that it would outgrow its Locust Point Headquarters in five years. (Id. ¶¶ 3, 55). Thus, Plank sought to move the Company's headquarters to the West Covington

---

[2] Unless otherwise noted, the Court takes the following facts from Plaintiff Scott King's Consolidated Complaint and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citations omitted). Additional facts will be discussed where relevant to the analysis.

[3] Patricia Mioduszewski is also a named Plaintiff. As detailed below, Mioduszewski filed a lawsuit against the Company and various directors on April 16, 2018. King filed a related lawsuit on August 30, 2018, and he was eventually named Lead Plaintiff.

section of South Baltimore through an urban renewal plan. (Id. ¶¶ 4–5). When Baltimore City officials rejected the plan, Plank redirected his efforts to expanding the Company's existing headquarters. (Id. ¶¶ 58–60).

However, Plank allegedly developed a plan, as early as 2012, to "covertly" acquire a substantial amount of real estate in the Port Covington neighborhood, intending to sell some of this land to the Company for use as its future headquarters. (Id. ¶¶ 65–66). Many of Plank's real estate acquisitions occurred between 2012 and 2014 through Plank's long-time acquaintance Marc Weller. (Id. ¶¶ 69–71). In June 2014, it was revealed that Plank was affiliated with Weller through Sagamore. (Id. ¶ 7).

In September 2014, Plank leased Port Covington land, owned by Sagamore, to the Company for use beginning in 2016. (Id. ¶¶ 74–75). The Company's Board, specifically its Audit Committee, then comprised of former director Anthony W. Deering and Defendants A.B. Krongard and Douglas E. Coltharp, approved the lease. (Id. ¶ 8). In 2016, Plank allegedly "caused" the Company to purchase the land that the Company had leased from Sagamore for $70.3 million (the "Port Covington Sale"). (Id. ¶ 88). The Company paid twice what Plank and Sagamore paid for the land two years earlier. (Id.). The Audit Committee approved the Port Covington Sale. (Id. ¶ 12). King alleges that, in addition to being unjustly enriched at the Company's expense through the Port Covington Sale, Plank also stands to make a substantial profit on Sagamore's future development of the Port Covington area. (Id. ¶ 90).

In addition to the Port Covington Sale, King alleges that Plank "caused" the Company to enter into several financially disadvantageous "related-party transactions"

with Plank's other companies. (Id. ¶ 98). For example, the Company leases a jet aircraft for business purposes from one of Plank's entities, even when it is used by Plank. (Id. ¶ 99). Another Plank entity owns a helicopter, and in June 2016, the Company began leasing that helicopter. (Id.). The Company paid Plank's entities $2.2 million, $2.4 million, $2.0 million, and $1.8 million to use these aircrafts during 2017, 2016, 2015 and 2014, respectively. (Id. ¶ 100). Additionally, in 2015, the Company entered a five-year lease with Sagamore for a large industrial space to carry out the Company's domestic manufacturing initiatives. (Id. ¶ 102; Compl. Ex. D ["Initial Report"] at 12, ECF No. 1-5). The annual lease rate was $5 million, subject to an annual escalation rate of 2.5 percent. (Id. ¶ 102). Finally, in March 2017, Plank opened a Baltimore hotel in partnership with Sagamore and War Horse, the real estate development company controlled by Plank's brother. (Id. ¶ 103). The Company plans to use this hotel for business purposes, and Plank and his brother are entitled to receive a percentage of the hotel's profits. In 2017 alone, the Company paid the hotel $4 million. (Id.).

Meanwhile, the Company's performance has allegedly declined, and its stock price has tumbled. (Id. ¶ 104). Since reaching a five-year high of almost $100 per share in 2015, the Company's stock price has dropped approximately 80 percent, hovering around $20 per share as of the filing of this suit. (Id.).

## B. **Shareholder Demand**

On May 25, 2017, Plaintiff Patricia Mioduszewski sent the Company's Board of Directors a letter stating that the Company "paid over $73 million in 2016 to businesses controlled by . . . Plank" and alleging that "these self-dealing transactions were not the

product of arm's-length negotiations and rather served to enrich Plank personally to the detriment of the Company and its stockholders." (Id. ¶ 115; Compl. Ex. A. ["Initial Demand"] at 1, ECF No. 1-2). The Initial Demand challenged the transactions identified above and accused Plank, the Directors, and other officers of breaching their fiduciary duties of loyalty and good faith by approving the related-party transactions and by failing to establish internal audit controls to prevent the approval of such transactions. (Initial Demand at 2). On behalf of the Company's shareholders, Mioduszewski demanded that the Board take action to recover damages for the benefit of the Company and to correct internal auditing systems. (Id.). The Initial Demand threatened legal action if the Board failed to act in a reasonable time frame. (Id.).

On June 1, 2017, the Company's attorney at Fried, Frank, Harris, Shriver & Jacobson LLP ("Fried Frank") acknowledged receipt of the Initial Demand. (Id. ¶ 116). On June 21, 2017, Mioduszewski's counsel received a letter from Williams & Connolly LLP ("W&C"), advising that W&C had been retained as counsel to investigate the Initial Demand. (Id. ¶ 117; see also Compl. Ex. C ["W&C Aug. 15, 2017 Letter"], ECF No. 1-4).

## C.     Review Group, Investigation, and Refusal

The Board appointed a Review Group—which consisted of Defendants Eric Olson, who was selected to lead it, and George Bodenheimer—to investigate the allegations in the Initial Demand. (Consol. Compl. ¶ 123; see Initial Report at 3). Following an investigation, the Review Group found no evidence supporting the allegations in the Initial Demand and prepared an Initial Report, recommending the Board decline to pursue claims relating to those allegations. (Consol. Compl. ¶ 123).

On January 8, 2018 and March 2, 2018, Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz"), counsel for Lead Plaintiff, sent letters to Fried Frank focusing on the Port Covington Sale and identifying deficiencies with the Initial Report and Review Group's investigation (together, the "Supplemental Demand"). (Id. ¶ 137).

On June 29, 2018, Fried Frank sent a letter to Kessler Topaz indicating that the Review Group had completed a "supplemental investigation" in response to the Supplemental Demand and issued a final report to the Board (the "Supplemental Report"), which was enclosed with the letter. (Id. ¶ 142). The Supplemental Report found no evidence supporting the allegations and again recommended the Board decline to pursue litigation. (Consol. Compl. Ex. 11 ["Suppl. Report"] at 3–12, ECF No. 42-3).

On April 16, 2018, Mioduszewski filed a derivative action against Plank, Coltharp, and Krongard on behalf of nominal Defendant Under Armour.[4] (ECF No. 1). On August 30, 2018, King filed a related lawsuit against the above-named Defendants as well as Adams, Bodenheimer, Katz, McDermott, Olson, Sanders (collectively, "Director Defendants"), and Sagamore. See Scott King v. Kevin Plank, No. 1:18-cv-01264-GLR (D.Md. filed Aug. 30, 2018).

On March 20, 2019, this Court issued an Order consolidating the cases, naming King as Lead Plaintiff, and appointing Kessler Topaz as lead counsel. (ECF No. 40). On May 1, 2019, King filed a Consolidated Complaint, alleging breach of duty against Plank

---

[4] In derivative lawsuits, the "claim pressed by the stockholder against directors or third parties is not his own but the corporation's," so the corporation is named as a defendant "to ensure its presence." Franklin v. Jackson, DKC 14-0497, 2015 WL 1186599, at *3 (D.Md. Mar. 3, 2015).

(Count I); breach of fiduciary duties against Director Defendants (Count II); aiding and abetting against Sagamore (Count III); and unjust enrichment against Plank and Sagamore (Count IV). (ECF No. 42). Plaintiff seeks disgorgement of unlawfully obtained profits and unspecified monetary damages. (Consol. Compl. at 48).

Defendants filed a Motion to Dismiss on July 2, 2019. (ECF No. 44). Plaintiff filed an Opposition and a Request for Hearing on August 29, 2019. (ECF Nos. 47, 48). On October 17, 2019, Defendants filed a Reply. (ECF No. 49).

## II.    DISCUSSION

### A.    <u>Standard of Review</u>

Derivative actions are governed by Federal Rule of Civil Procedure 23.1, which requires plaintiffs to "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort.'" <u>Jolly Roger Fund LP v. Sizeler Prop. Inv'rs, Inc.</u>, No. RDB-05-841, 2005 WL 2989343, at *7 (D.Md. Nov. 3, 2005) (quoting Fed.R Civ.P. 23.1) (emphasis removed). "[L]ike a Rule 12(b)(6) motion, the plaintiff's allegations receive the benefit of a presumption of truthfulness, and the Court will accept as true well-pleaded allegations and draw all fair and reasonable factual inferences in the plaintiff's favor that flow logically from those facts." <u>Morefield v. Bailey</u>, 959 F.Supp.2d 887, 896 (E.D.Va. 2013) (citing <u>In re ITT Corp. Derivative Litig.</u>, 653 F.Supp.2d 453, 457 (S.D.N.Y. 2009)).

**B.** <u>Analysis</u>

The business judgment rule protects corporate directors from liability when the majority of directors act prudently and in good faith. <u>Devereux v. Berger</u>, 284 A.2d 605, 612 (Md. 1971). The rule's protection "can be claimed only by disinterested directors whose conduct otherwise meets the tests of business judgment."[5] <u>Boland v. Boland</u>, 31 A.3d 529, 549 (Md. 2011) (internal quotations and citations omitted). To be considered disinterested, "directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." <u>Id.</u> Thus, "[u]nder the traditional business judgment rule, courts apply a presumption of disinterestedness, independence, and reasonable decision-making to all business decisions made by a corporate board of directors." <u>Oliveira v. Sugarman</u> ("<u>Oliveira II</u>"), 152 A.3d 728, 736 (Md. 2017).

---

[5] In the Consolidated Complaint, Plaintiff argues that Olson and Bodenheimer, the only members of the Review Group, "[did] not appear to be able to independently and impartially consider the Demand," and that they, along with the other Defendant Directors, were "beholden to Plank," because he determined who sat on the Board. (<u>See</u> Consol. Compl. ¶ 135). Plaintiff then concluded that the refusal was wrongful because a "conflicted Board" rubberstamped the Review Group's recommendation. (<u>Id.</u> ¶ 150).

In their Motion to Dismiss, Defendants note that Plaintiff failed to offer any particularized allegations sufficient to demonstrate that a majority of the Board lacked independence or disinterestedness and challenge Plaintiff's generalized allegation as to each member of the Board and Review Group. (<u>See</u> Mot. Dismiss at 14–20). Plaintiff fails to address any of these arguments in his Opposition. Thus, the Court concludes that Plaintiff has abandoned his claim that the Defendant Directors were not disinterested. <u>Muhammad v. Maryland</u>, No. ELH-11-3761, 2012 WL 987309, at *1 n.3 (D.Md. Mar. 20, 2012) ("[B]y failing to respond to an argument made in a motion to dismiss, a plaintiff abandons his or her claim.").

Developed as a check on that power, derivative lawsuits allow shareholders to bring "suit to enforce a corporate cause of action against officers, directors, and third parties" when the directors or those in control of the company refuse to assert a claim belonging to the corporation. Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 95 (1991). Because a derivative lawsuit encroaches upon the board of directors' managerial control, shareholders must either make a demand on the board that the corporation initiate litigation or show that the demand is excused as futile. Id. at 96. Once a demand is made, the board must investigate the allegations and determine if litigation is in the corporation's best interests. Bender v. Schwartz, 917 A.2d 142, 152 (Md. 2007). A committee of disinterested directors, appointed by the board, may conduct the investigation. Id.

The board's decision to deny a demand receives the same business judgment rule presumption as other board decisions. Boland, 31 A.3d at 549. "In determining whether a demand was wrongly refused, a court reviews the board's investigation under the business judgment rule, deferring to the decision of the board or committee" unless a plaintiff can demonstrate that the board's investigation or decision "was not conducted independently and in good faith, or that it was not within the realm of sound business judgment." Bender, 917 A.2d at 152. A plaintiff's allegations cannot be based on "mere suspicions" and must be stated with particularity. Id. at 152–53.

Here, Plaintiff challenges the reasonableness of the Review Group's investigation, arguing the Review Group initially failed to interview key witnesses; delegated the investigation process to outside counsel, who did not act independently; and produced an

inadequate report. Defendants assert that Plaintiff's allegations are facially insufficient to overcome the business judgment rule. The Court agrees with Defendants.

In assessing whether a demand investigation was conducted reasonably and in good faith, Maryland courts consider the following non-exhaustive factors: (1) whether the committee engaged independent counsel; (2) whether the committee "produced a report, the length of such report, and whether the report documented the committee's procedures, reasoning, and conclusions"; (3) "whether the committee properly identified the claims at issue"[6]; (4) "whether the committee reviewed the testimony of or interviewed directors, officers, and employees"; (5) whether the committee "reviewed documents regarding the complained-of transactions"; and (6) "the number of times the demand committee met." Bender, 917 A.2d at 155–56. The Court considers each factor in turn.

### 1. Independent Counsel

Defendants note that the Review Group retained W&C as independent counsel to assist with the investigation. Further, Defendants contend that Plaintiff's assertion that W&C may not have acted independently is the sort of "generalized or speculative allegation" rejected by Werbowsky v. Collomb, 766 A.2d 123, 143 (Md. 2001).

Plaintiff criticizes the Review Group's engagement of W&C as an "abdication" of its investigatory and decision-making responsibilities and questions whether W&C acted independently. Plaintiff asserts that the Review Group, relying solely on W&C's efforts,

---

[6] Plaintiff does not allege, and there is nothing in this record suggesting, that the Review Group improperly identified the claims at issue. Accordingly, the Court presumes that this factor weighs in Defendants' favor and will not analyze it independent of the Court's evaluation of the sufficiency of the Review Group's report.

failed to participate in the document review, interview, report drafting, and review processes. Plaintiff further argues that, to the extent Defendants raise a "reliance on counsel defense," it should be rejected as a "fact-intensive, affirmative defense" warranting further discovery.[7] (Pl.'s Mem. Opp'n Defs.' Mot. Dismiss Pl.'s Consol. Compl. ["Opp'n"] at 25, ECF No. 47). Finally, Plaintiff contends that the Review Group's lack of participation in the investigatory process demonstrates a failure to act reasonably and in good faith.

Plaintiff's argument regarding the Review Group's reliance on outside counsel is unavailing. First, Plaintiff alleges that Kessler Topaz emailed a letter to W&C requesting the names of the directors who were reviewing the Demand on June 23, 2017 and again on August 24, 2017; the August letter also requested an update on the status of the investigation.[8] (Consol. Compl. ¶¶ 118–19). On August 28, 2017, Kessler Topaz received a "cryptic" email from W&C acknowledging receipt of the August 24 letter and stating that it was "referred . . . to Under Armour and the Company's legal counsel." (Id. ¶ 120) (alteration in original). Based on that email, which Plaintiff did not submit as an exhibit, Plaintiff argues that W&C did not act independently. The Court is unaware of any authority—and Plaintiff cites none—holding that a single communication between corporate counsel and independent counsel, without more, eviscerates the latter's claim that it acted independently.

---

[7] According to Defendants, Plaintiff misconstrues their argument, which does not raise such a defense but instead asserts that the Review Group was entitled to delegate investigative tasks to independent counsel. (See Reply Mem. Supp. Defs.' Mot. Dismiss Pl.'s Consol. Compl. ["Reply"] at 11 n.6, ECF No. 49).

[8] Contrary to counsel's assertions, neither letter is attached to the Consolidated Complaint.

Second, while Plaintiff may disagree with W&C's level of involvement in the investigation, the Review Group was not legally obligated to conduct every aspect of the investigation. Maryland courts have recognized that a "Demand Committee [is] entitled to rely on independent counsel to investigate and advise." Bender, 917 A.2d at 162. Commensurate with the discretion to engage independent counsel is the authority to delegate investigatory tasks. See, e.g., Zucker v. Hassell, No. CV 11625-VCG, 2016 WL 7011351, at *10 (Del.Ch. Nov. 30, 2016), aff'd, 165 A.3d 288 (Del. 2017) (concluding that the "informed decision to delegate a task is as much an exercise of business judgment as any other").[9] Moreover, Plaintiff does not allege that W&C is not competent in the area of corporate governance and litigation, such that W&C's involvement may have adversely impacted the integrity or result of the investigation. See Oliveira v. Sugarman ("Oliveira I"), 130 A.3d 1085, 1097 (2016), aff'd, 152 A.3d 728 (2017) (finding that demand investigation was reasonable where committee "hired highly respected and experienced legal counsel to assist").

Third, the Review Group's decision to delegate aspects of the investigation does not mean, and Plaintiff offers no evidence proving, that the Review Group played absolutely no role in the fact-gathering and decision-making processes. Plaintiff's allegations amount

---

[9] "This Court frequently looks to Delaware courts for guidance on issues of corporate law." Oliveira II, 152 A.3d at 736; see also Shenker v. Laureate Educ., Inc., 983 A.2d 408, 420 n.14 (Md. 2009) ("This Court has noted the respect properly accorded Delaware decisions on corporate law ordinarily in our jurisprudence.") (internal quotation marks omitted).

to, or are based on, "mere suspicions"—precisely the sort of allegations <u>Bender</u> rejects. 917 A.2d at 153–54.

Fourth, the Review Group identified its involvement in the investigatory and decision-making processes in both reports. For example, the Initial Report indicates that the Review Group met with W&C to discuss the status of the investigation, considered the legal merits of the potential claims under W&C's advice, and examined whether litigation would be in the Company's best interest. Maryland courts have expressly adopted the Delaware rule, providing that "statements contained in a letter refusing demand, when the demand was refused by a board consisting of majority-disinterested and majority-independent directors, are presumptively true absent a particularized allegation rebutting a specific statement." <u>Oliveira I</u>, 130 A.3d at 1099. Consistent with this principle, the Review Group's statements regarding its participation are presumed to be true, and Plaintiff's conclusory allegation that the Review Board did nothing falls short of rebutting those statements.

The Court thus concludes that this factor—engagement of independent counsel—weighs in Defendants' favor when considering the extent to which the investigation was conducted reasonably and in good faith.

## 2. Frequency of Meetings

W&C was retained around August 2017 to investigate the Initial Demand, and the Supplemental Report was produced on June 29, 2018. It is undisputed that the Review Group and W&C met only three times over the course of both investigations. Three

meetings of unknown duration over the course of ten months seems scant. This factor weighs in Plaintiff's favor.

### 3.    Interviews and Document Review

Plaintiff argues that the investigation was unreasonably deficient because W&C failed to interview Sagamore President Weller, who he characterizes as a "key figure in Plank's acquisition of the Port Covington parcels;" Plank's brother, who was "heavily involved in Under Armour's real estate endeavors" before partnering with Sagamore; and Defendant Coltharp, an Audit Committee member who would have "approved the Port Covington Sale and other related-party transactions comprising the focus of the Demand." (Opp'n at 22). Plaintiff also highlights W&C's failure to review pre-2014 Board and Audit Committee materials and documents from Sagamore, Plank Industries, and Plank in his personal capacity.

Defendants note that the Review Group, through W&C, initially conducted sixteen interviews with thirteen witnesses, including Plank; Deering and Krongard, who are members of the Board and the Audit Committee; Neil Jurgens, the Company's Senior Vice President of Global Real Estate; Andrew Page, the Company's Corporate Controller; Mehri Shadman, the Company's Senior Counsel; and Tom Geddes, CEO of Plank Industries. (See Initial Report at 4–5). Upon receiving the Supplemental Demand, the Review Group launched a second investigation, interviewing six additional witnesses and re-interviewing Plank, Krongard, and Jurgens. (Suppl. Report at 4–5).

As to the types of the documents examined, Defendants note that the Review Group, through W&C, initially reviewed approximately 2,000 pages of filings in a related

litigation; Securities and Exchange Commission ("SEC") documents; the Company's governance documents; and approximately 2,000 pages of Company documents and related internal documents, such as board meeting minutes, Audit Committee materials, and meeting minutes from 2014 to 2016. (See Initial Report at 3–4). In response to the Supplemental Demand, the Review Group, through W&C, further considered press coverage of the Company's various related-party transactions, an additional 600 pages of documents related to alternative locations for the Company's headquarters, and approximately 2,400 pages of documents regarding Plank and Sagamore's public comments and presentations. (See Suppl. Report at 3–4).

As courts have observed, "there is obviously no prescribed procedure that a board must follow" when responding to a demand. Oliveira I, 130 A.3d at 1097. Accordingly, "the substance and scope of the required investigation will 'turn on the nature and characteristics of the particular subject being investigated'" and the key question is simply "whether the board 'acted on an informed basis in rejecting [the] demand.'" Bender, 917 A.2d at 155 (citing Levine v. Smith, 591 A.2d 194, 213 (Del. 1991), overruled on other grounds Brehm v. Eisner, 746 A.2d 244, 251 (Del. 2000)). "[A] stockholder's criticisms regarding the types of documents reviewed or the persons interviewed in connection with an investigation" are insufficient to render a demand investigation unreasonable. Belendiuk v. Carrion, No. 9026–ML, 2014 WL 3589500, at *6 (Del.Ch. July 22, 2014).

Here, the Review Group accurately identified the legal claims raised in the Demands as follows: whether Plank, in collusion with Sagamore, breached his fiduciary duties by causing the Company to enter into the challenged transactions and usurping the Company's

opportunity to purchase and develop land in the Port Covington area; whether Plank and Sagamore were unjustly enriched by the transactions; and whether other Board members breached their fiduciary duties by approving the challenged transactions.

With the assistance of counsel, the Review Group reviewed documents and interviewed witnesses reasonably calculated to identify which, if any, claims warranted legal action. For example, the Review Group, through W&C, examined the Company's policy governing related-party transactions; independent appraisal information regarding the Company's related-party transactions with Plank; and Audit Committee materials and meeting minutes from 2014 to 2016. (See Initial Report at 4). The Review Group interviewed the Company's directors and officers, including its CEO and two directors.

After conducting its initial investigation, the Review Group decided to reject the Initial Demand and outined it's reasoning for doing so in its Initial Report. When confronted with Plaintiff's assertion that the Review Group failed to consider "key" witnesses and documents, the Review Group, without being asked, launched a second investigation to address those alleged deficiencies. In doing so, the Review Group re-interviewed witnesses and interviewed others specifically identified by Plaintiff. The Review Group's decision remained unchanged at the conclusion of that second investigation, and it again recommended that the Board reject the Demand.

Though it was not obligated to do so, the Review Group augmented its investigation using the roadmap Plaintiff provided, addressing specific concerns raised in the Supplemental Demand. Accordingly, the Court is not persuaded by Plaintiff's continued criticism of the witnesses interviewed and documents reviewed, as disagreement with those

aspects of the investigation are insufficient to render the investigation unreasonable. See Belendiuk, 2014 WL 3589500, at *6.

### 4. Production and Substance of Report

Plaintiff notes that neither the fifteen-page Initial Report nor the thirteen-page Supplemental Report contained "appendices or exhibits to document how and on what basis the Review Group's counsel reached its conclusions." (Opp'n at 24). Plaintiff dismisses the reports as "shallow" and reflective of the depth of the investigation. (See id.). Defendants argue that courts have not established a minimum page limit and have upheld refusal decisions where demand committees produced reports of similar length or even no report. Defendants further assert that the reports sufficiently document the Review Group's procedures, reasoning, and conclusions irrespective of their length.

Boland makes clear that "the mere length of the report and the sheer volume of items considered should not be given undue weight by the court. Page totals are a shallow metric, especially given the 'relative ease with which a committee could construct a record of apparently diligent investigation.'" 31 A.3d at 566 (citing Abella v. Universal Leaf Tobacco Co., 546 F.Supp. 795, 799 (E.D.Va. 1982)). Although the page count is relevant, of equal import is the "thoroughness of the [committee's] investigation and the reasonableness of the methodology it employed." Id. at 569. To that point, courts also consider whether the report documented the committee's procedures, reasoning, and conclusions. Bender, 917 A.2d at 156.

Here, the Initial and Supplemental Reports total twenty-eight pages. Despite their brevity, each report describes the procedures, reasoning, and conclusions of the Review

Group, which were adopted by the Board. As described above, the Initial Report defined the potential claims against the Company and identified the scope of W&C's review, including the documents reviewed, the individuals interviewed, legal issues researched, and consultations with the Review Group. The Review Group ultimately concluded that there was no evidentiary support for the potential claims and recommended that the Board deny the demand. (<u>See</u> Initial Report at 15). In doing so, the Review Group outlined its reasoning, which included consideration of: (1) the merits of the potential claims, including burdens of proof and possible defenses; (2) legal standards governing breach of fiduciary duty, the business judgment rule, third-party transactions, and usurpation of corporate opportunity; (3) whether pursuing the demand was in the Company's best interest; (4) individualized review of the challenged transactions, coupled with a review of the Company's "Policy on Transactions with Related Persons"; (5) the cost of the litigation relative to the likelihood and magnitude of financial recovery; (6) indemnification of, and advance payment to, directors and officers embroiled in litigation; (7) effects of litigation on the Company's operations, reputation, employee morale, and talent acquisition and attrition; and (8) the potential for counterclaims and countersuits. (<u>Id.</u> at 3–15).

Similarly, the Supplemental Report identified the Review Group and W&C's investigatory process, which included reviewing the Supplemental Demand, expanding the scope of its investigation to include documents that would address the concerns raised in the Supplemental Demand, interviewing additional individuals, investigating the Port Covington deal in greater detail, supplementing legal research, and consulting with the

Review Group. (See Suppl. Report at 3–12). The Review Group once again recommended that the Board reject the Supplemental Demand.

As in the Initial Report, the Review Group explained the bases for its decision, which including consideration of: (1) applicable legal standards; (2) the circumstances surrounding the Port Covington Sale; (3) continued evaluation of legal costs that would be incurred under the Company's indemnification obligations; and (4) Company-oriented concerns previously addressed in its Initial Report, such as harm to the Company's reputation and diminished employee morale. (Id. at 5–12).

Although Plaintiff criticizes the content and page count of each report, the Court concludes that the reports adequately document the committee's procedures, reasoning, and conclusions. The Court's conclusion is not altered by what Plaintiff characterizes as inconsistencies between the reports.

First, Plaintiff alleges that "after stating falsely in the Initial Report that Plank began acquiring parcels in Port Covington in 2014, the Supplemental Report finally acknowledged that Plank began these acquisitions in 2012." (Consol. Compl. ¶ 145). Second, Plaintiff asserts that after "claiming incorrectly in the Initial Report that Port Covington 'emerged as an attractive candidate' for the Company's corporate headquarters in 2016, the Supplemental Report acknowledged that the Company had decided to move to Port Covington much earlier than that." (Id. ¶ 146) (internal citations omitted).

However, Plaintiff fails to explain how these facts would have altered the Review Group's conclusions that the evidence did not support a claim for usurpation of corporate opportunity and that the Company paid fair market value in the Port Covington deal.

Irrespective of when Plank began acquiring land in Port Covington or when the Company developed an interest in relocating to that area, the Review Group's initial investigation uncovered these dispositive facts: (1) that the Board declined Plank's 2014 proposal that the Company acquire land in Port Covington but agreed that Plank could purchase the land himself, without promising that the Company would purchase the land from him in the future; and (2) when the Company decided to relocated to Port Covington in 2016, the Company obtained market appraisals from two companies, thus informing the Company's decision to purchase the parcel for $70.3 million. (See Initial Report at 9, 11). The alleged inconsistencies identified by Plaintiff are inconsequential in analyzing whether Plank usurped the Company's opportunity to purchase property in Port Covington and whether he was unjustly enriched through the Port Covington Sale.

Third, Plaintiff asserts that "despite suggesting in the Initial Report that the Port Covington Sale was governed by the Company's Policy on Transactions with Related Persons ["TRP"], the Supplemental Report now attributes a statement to Defendant Krongard that the Port Covington Sale was instead governed by a purported 'tacit agreement.'" (Consol. Compl. ¶ 146) (internal citations omitted). As Defendants note, this assertion is premised on a misunderstanding of the Supplemental Report, which does not state or even suggest that the "tacit agreement," which also concerns the conditions under which the Company would negotiate with Sagamore, replaced or preempted the Company's TRP Policy.

Fourth, Plaintiff contends that "while the Initial Report indicated that the negotiations between Under Armour and Sagamore focused on the [Port Covington]

purchase price," the Supplemental Report identifies these other considerations: "(1) the assumption of prospective environmental liabilities; (2) investment of tax-increment financing; and (3) possible other tenants in the non-[Under Armour] Port Covington parcels." (Id. ¶ 147) (internal citations omitted). As Defendants argue, just because the negotiations "focused" on the price for the Port Covington Sale does not mean that the companies did not discuss other considerations.

Fifth, Plaintiff notes that "whereas the Initial Report stated that 'th[e] purchase [for the Port Covington Sale] represented an approximate $1.5 million loss to Sagamore' the Supplemental Report now clarifies that this figure was calculated 'according to Sagamore leadership.'" (Id. ¶ 148) (alterations in original). This "clarification" does not render the calculation false, and Plaintiff has offered no evidence suggesting that the figure is inaccurate simply because Sagamore provided it. The Court is thus unpersuaded that differences in the Initial and Supplemental Reports provide evidence that the investigatory process was unreasonable or conducted in bad faith.

In sum, an analysis of the <u>Bender</u> factors persuade the Court that Plaintiff's allegations do not overcome the presumption that the Review Group's investigations were conducted reasonably and in good faith.[10] Upon receiving the Initial Demand, the Company properly identified the claims at issue and retained independent counsel, who assisted the Review Group in examining probative documents and interviewing directors, officers, and

---

[10] Because the Court ultimately concludes that the Review Group's initial investigation was conducted independently and in good faith, the Court will not consider Plaintiff's argument that the Review Group was not entitled to a "do over."

others regarding the challenged transactions, culminating in the production of two reports that documented the Review Group's procedures, reasoning, and conclusion.

Plaintiff has failed to rebut the presumption of reasonableness of the investigation. Therefore, under the business judgment rule, the Court must defer to the Review Group's conclusions, as adopted by the Board, and dismiss the Consolidated Complaint.

## III.   CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motion to Dismiss Plaintiff's Verified Consolidated Shareholder Derivative Complaint and Request for Hearing (ECF No. 44) and deny Plaintiff's Request for Hearing (ECF No. 48). A separate Order follows.

Entered this 30th day of March, 2020.

_____/ s/_____

George L. Russell, III
United States District Judge
